Decided 25 June, 1907.

## WEST *v.* WASHINGTON RAILWAY CO.

90 Pac. 666.

EFFECT OF EVIDENCE CONSIDERED.

1. The evidence satisfies the court that the parties hereto entered into an agreement to lease the property in dispute with an option to the lessee to purchase it for $1,500 as claimed by plaintiff.

CORPORATIONS—AUTHORITY OF GENERAL MANAGER—RATIFICATION.

2. Where the general manager of a corporation, who is actually in control of its business, enters into a contract on behalf of such corporation that is not evidently beyond the scope of his apparent authority, and, with knowledge of the facts, the consideration is retained by the corporation and no objection made to the contract, the legal conclusion is that the act of the manager has been approved, or that he had full authority to make the contract originally—and in either case the corporation is bound.

SPECIFIC PERFORMANCE OF ORAL CONTRACT TO SELL—WRITINGS.

3. Where a parol contract is sufficiently definite to be specifically enforceable, the right to such relief is not affected by the fact that a written memorandum of the contract subsequently prepared and signed by the vendor and tendered to the vendee for signature does not correctly state the terms orally agreed upon, since the rights of the parties were fixed before the writing was made, and the latter is only a circumstance in the general history of the controversy.

SPECIFIC PERFORMANCE—DEGREE OF PROOF REQUIRED.

4. One seeking the specific performance of an oral contract need not establish a clear and definite contract beyond a reasonable doubt, but it will be sufficient to satisfy the court that the contract was made as claimed by plaintiff.

SPECIFIC PERFORMANCE—EFFECT OF EVIDENCE.

5. In view of the inherent probability of the truth of plaintiff's claim that he was given the right to purchase the land in question, and from the fact that he took possession without objection and made permanent improvements, the conclusion is that the defendant agreed to sell as claimed.

STATUTE OF FRAUDS—EFFECT OF PART PERFORMANCE.

6. Where a lessee takes possession under a lease with an option to purchase during the term at an agreed price, complies with all the terms of the lease, and in addition makes permanent improvements, there is such a part performance of the option as to dispense with the requirements of the statute of frauds.

SPECIFIC PERFORMANCE—NEED OF TENDER AFTER REFUSAL TO ACCEPT.

7. After a vendor has refused to accept further payments on a contract the vendee need not make any additional tender as a condition of enforcing specific performance of such contract.

SPECIFIC PERFORMANCE—EFFECT OF INCUMBRANCE.

8. Where, in a suit for specific performance, the complaint alleged that at the time of making the contract defendant was the owner in fee and in possession of the property, and the answer admitted such allegations,

and alleged that defendant had been and was the owner of the property which was incumbered by a real estate mortgage, a provision in the contract that the sale should be completed at complainant's option, as soon as title was perfected, did not preclude complainant from waving release of the mortgage and enforcing specific performance; defendant being entitled to a reasonable time thereafter in which to discharge the mortgage lien.

SPECIFIC PERFORMANCE—SUIT AS WAIVER OF INCUMBRANCE.

9. A vendee having a contract to purchase as soon as he may desire after the vendor's title shall be perfected may waive the preliminary requirement of title and demand a deed at any time, and the bringing of a suit for specific performance is such a waiver, though the title must be subsequently perfected within a reasonable time.

SPECIFIC PERFORMANCE—SCOPE OF RELIEF AFFORDED.

10. Where a vendor has leased property with an option to the lessee to purchase during the term, and then refuses to perform upon demand and retakes possession, the lessee is entitled to a decree restoring the possession, and directing the vendor to execute a deed upon payment of the contract price if the vendee so desires.

SPECIFIC DECREE—DAMAGES.

11. In a suit for specific performance, the court, having acquired jurisdiction, may assess such damages as appear to have been sustained prior to the filing of the complaint as incidental to the remedy of specific performance.

APPORTIONMENT OF COSTS.

12. Costs in equity cases may be apportioned to suit the particular case under consideration, as that the successful appellant be allowed only the costs and disbursements of the appeal.

From Umatilla: WILLIAM R. ELLIS, Judge.

Statement by MR. COMMISSIONER KING.

This is a suit in equity brought by Peter West against the Washington & Columbia River Railway Co. for the specific performance of a lease with an option to purchase lots 1, 7 and 8, of block 74, in Reservation Addition to Pendleton, Oregon. The complaint alleges that defendant is a corporation doing business in Oregon and Washington; that on or about March 15, 1900, plaintiff and defendant entered into an oral agreement, whereby plaintiff was given an option to buy the lots named for $1,500 within 10 years from that date; that, together with the granting of such option, defendant agreed to lease the property to plaintiff for 10 years for $100 per annum; that, as soon as convenient thereafter, a written lease, including the terms orally agreed upon, was to be executed; that at the time of entering

into the agreement constituting the terms of the lease and option plaintiff paid defendant $100 thereon, and, with its consent, took possession and permanently improved the property at a cost of $50; that he retained possession under the oral lease until January 19, 1902, on which date defendant wrongfully took possession of the property, removed the improvements, and commenced the construction of a depot thereon; that by reason thereof plaintiff is damaged in the sum of $500; that he has done all things required of him under the contract, and has been, and is, ready and willing to pay the purchase price of the property. A decree is accordingly demanded to the effect that defendant be perpetually enjoined from erecting any buildings thereon or from otherwise interfering with plaintiff's possession; that it be compelled to convey the real property to plaintiff; and that plaintiff have judgment for $500 damages, together with such other relief as may be deemed proper.

Defendant, by answer, admits its corporate capacity, and that it is the owner in fee of the premises, but denies all other allegations, and, as an affirmative defense, alleges that shortly prior to April 1, 1900, West entered into negotiations with defendant for a lease of the three lots referred to for a period of 10 years thereafter; that on April 1 of that year defendant submitted to plaintiff for his approval and signature a written lease executed in duplicate, being as follows:

"Articles of Agreement, entered into this 1st day of April, 1900, by and between the Washington & Columbia River Railway Company, a corporation, party of the first part, and Peter West of Pendleton, Oregon, party of the second part, Witnesseth:

That the Party of the First Part, in consideration of the agreements hereinafter contained, on the part of the party of the second part, hereby leases and lets unto the party of the second part, for the term of ten (10) years commencing from the date above written, the following described premises, situated at Pendleton Station, County of Umatilla, and State of Oregon, to-wit: All of lots one (1), seven (7) and eight (8) of block seventy-four (74), Reservation Addition to Pendleton.

Said Party of the Second Part, for and in consideration of the above leasing, agrees to pay to the party of the first part an annual rental of one hundred dollars, payable annually in ad-

vance for the first year, and every six months thereafter, and also to pay before the same shall become delinquent, all special taxes and assessments levied or assessed during the continuance of this lease upon the property hereby leased, and all regular and special taxes upon any buildings or improvements placed thereon by the party of the second part, and also, as a consideration of this lease, agrees that the Washington & Columbia River Railway Company shall not be held liable for any loss or damage by fire arising from the operation of said railroad caused by sparks from the locomotives, or otherwise.

And the Party of the Second Part also agrees to keep the premises above described clear and free from rubbish or other inflammable material which would tend to increase the risk of fire or give the grounds hereby leased or the grounds surrounding the same, an untidy appearance.

It is Further Understood and Agreed, that the party of the second part shall have no power to assign this lease or any interest therein, or sublet the whole or any part of the property leased to any person, persons or corporation, without first obtaining the written consent of the party of the first part.

It is Further Agreed that the party of the second party will surrender and vacate the premises immediately upon the termination of this lease and have the right to remove everything therefrom, whether the same be terminated by the expiration thereof, or by failure to comply with any of the provisions of this lease, reasonable time being allowed for removing everything therefrom.

A Failure by the Lessee to keep and perform any stipulation, condition or contract contained in this lease, to be kept or performed by such lessee, shall operate as a forfeiture of this lease and all the rights of the lessee herein except as to removing as aforesaid, everything therefrom, and the lessor may take immediate possession of said premises without any notice whatever, it being understood and agreed that said party of the second part shall have the privilege of buying the above leased lots as soon as title is perfected.

In Witness Whereof, the parties hereto have caused these presents to be properly signed and sealed the day and year hereinbefore written.

Washington & Columbia River Railway Co.,

In presence of         By J. P. McCabe,
J. G. Cutler,            Vice Pres. and Gen. Mgr.
W. T. Dovell."

It is also alleged by defendant that the written instrument referred to contains the whole of the contract and all terms agreed upon between them; that the written contract was not signed by plaintiff, but after receiving the duplicate copy, plaintiff, wrongfully and without authority, inserted therein after the word "lots" the words "for $1,500," thereby making the last sentence of the written instrument read to the effect that plaintiff should have the privilege of buying the property for $1,500. It is then averred that plaintiff returned the altered copy of the lease and retained the other copy; that defendant would not accede to the change made therein; that plaintiff went into possession of the lots wrongfully and unlawfully on or about April 1, 1900, inclosed the same with a fence at a cost of about $25, and retained possession until October, 1901. Defendant then asks that the suit be dismissed, the temporary restraining order dissolved, and for such other further and general relief as may be deemed equitable. A reply was filed placing the case at issue. The cause was tried before the court, resulting in a decree dismissing the suit, from which plaintiff bring this appeal.

REVERSED.

For appellant there was a brief and an oral argument by *Mr. Robert Jay Slater.*

For respondent there was a brief over the name of *Carter & Raley,* with an oral argument by *Mr. Charles Harrison Carter.*

Opinion by MR. COMMISSIONER KING.

1. On March 14, 1900, Joseph McCabe, as agent for defendant, entered into an oral agreement with plaintiff, to the effect that West should have a lease on the premises for a period of 10 years at an agreed rental of $100 per annum, the first year's rent to be paid on the date of the agreement, and $50 semiannually thereafter. Plaintiff was to have the privilege of purchasing the property at any time during the period of the lease, and it was understood that a written lease should thereafter be drawn containing the terms agreed upon. It was agreed that plaintiff should have the right to take immediate possession, and

accordingly paid $100, constituting the first year's rent.   With
the knowledge and consent of defendant, plaintiff took posses-
sion of the property and inclosed the lots with a substantial
fence.   His possession continued until January 19, 1902, when
he was ousted by defendant.   On April 16, 1900, McCabe ex-
ecuted and forwarded to West what purported to be a written
lease, being the instrument referred to in the answer, on re-
ceipt of which West, without affixing his signature thereto,
placed it on record.   Ten months later he returned the dupli-
cate copy to McCabe, with his signature attached, with the
words "for $1,500" inserted after the word "lots," and preceding
the clause "as soon as title is perfected"; and insisted that the
understanding was to the effect that the inserted words were to
be included in the lease when executed, which defendant dis-
puted.   On receipt of the duplicate copy defendant delivered it
to its attorney, Chas. Carter, and wrote to West as follows:

"Walla Walla, Wash., March 14, 1901.
Peter West, Esq.,
    Pendleton—
  Dear Sir:   Yours received.   Before accepting any further
rental from you for the ground, I desire that you see Mr. Carter
and remove from the lease the addition which you made without
our consent or authority.   Unless this is done promptly, I shall
cancel lease and return your remittance.
                              Yours truly,
                                J. P. McCabe,
                                  G. M."

Plaintiff refused to strike out the inserted words, and insisted
upon the lease, with option to purchase for $1,500, being re-
tained, and refused possession to the defendant.   West tendered
the company a draft for $50 semiannually thereafter to be ap-
plied in payment of the rent agreed upon, all of which drafts
were returned, except one, which it appears was returned to
plaintiff during the trial.

The only question of fact bearing upon the issues upon which
any conflict of testimony appears, and as to which there can be
any doubt, is as to whether West was given the option to pur-
chase for the price named.   On this point plaintiff testified, in

substance, that on the afternoon of March 14, 1900, McCabe, as agent for defendant, agreed to let him have the lots at a yearly rental of $100 for 10 years, with the privilege of purchasing for $1,500, which agreement was made with him in the presence of Mrs. West; that the matter was discussed during the forenoon of that day, at the depot in Pendleton, in the presence of Walter Adams, the local agent of the company; that, the lots having previously been offered for sale, West had written to McCabe, offering to buy them, after which McCabe came to see him concerning them; that he told McCabe he would buy the lots, to which he replied that he asked $1,500 for them, stating there was a mortgage on the property which he would have released, but would lease the land to him for the term of 10 years, with the privilege of purchasing for $1,500, the rent to be $100 per annum, payable in advance for the first year, and $50 semi-annually thereafter, and that on receipt of $1,500 defendant would execute a deed to him, and, on being asked how long he thought it would take to release the mortgage, McCabe stated it would be done within the year, but might be a little later; that they had more property for sale on that street, which they did not use, all of which could be released in one instrument; that West accepted the terms proposed, paid the $100 for the first year, went into possession as agreed, and inclosed the same with a good and substantial fence at an expense of $50. All of this testimony is corroborated by Paulina West, wife of plaintiff, whom it is conceded was present when the agreement was consummated and the money paid.

McCabe, in his testimony, admits all these statements, except as to the option to purchase at a fixed price, and states he did not agree to sell to West at any price, as he had no authority to sell, and could not do so because it was mortgaged; that the lots had been offered for sale for some time, having been placed in the hands of Jackson & Dickson Co.; that it was supposed that the property was in the hands of the trustee in fee simple, but discovered, after having negotiated and partially completed some sales, that the general mortgage had been given thereon

subsequent to the deed to the trustee, and that they did not
know that fact when they first started to sell the property, but,
as soon as this was learned, it was withdrawn from the market.
It is.admitted that West wanted to purchase, to which applica-
tion McCabe says he answered:

"The only way we could let you have these lots is on a lease.
I can make a long term lease on it for the term of 10 years,
which is the limit of my authority as to time.   I proposed mak-
ing him a 10-years' lease to the property, and only (let him
have) possession of it for $100 per annum, which was agreea-
ble, and he took it on these terms.   I saw him later in the
afternoon of this date at his home and had some talk with him
about it, and it was understood that I should prepare the lease
at my leisure."

Witness further adds:

"I never told West at his house that he could purchase the
property at any price."

He explained the clause, "it being understood and agreed that
the party of the second part shall have the privilege of buying
the above listed lots as soon as title is perfected," as referring
to the maturity of the mortgage or condition whereby it could be
released by the mortgagee; that he did not tell West that he
could have the mortgage released, but stated he had no reason
to think that that could be done, but that he might have told
him he would make an effort to do so, and thought they had
some conversation along that line.   Witness then states he had
no authority to say what the property could be sold for, but
that, as to the $100, he turned it over to the company, which it
has retained; that West sent him $50 every six months, all of
which was returned; that he notified West he had canceled the
lease and afterwards placed Mr. Schultz in possession of the
property as tenant, subsequently securing a release from him,
and started to erect a depot on the lots when he was enjoined
by plaintiff.   It is shown they had some conversation as to the
terms of the agreement in the presence of Adams, who testified
to the same effect and corroborated McCabe's statements in
reference to his refusal to sell.   Adams' statements agree with

the testimony of West to the effect that plaintiff wanted to purchase from McCabe, and that McCabe answered to the effect that he would not sell, but would give him a lease for 10 years. This occurred in the forenoon, and during the latter part of the day McCabe went to plaintiff's residence, at which time and place, and in the presence of Mrs. West, the deal was closed and the first year's rent there paid. It will be observed that the only disputed point is concerning the sale and price to be paid. No dispute arose as to what was to be in the written lease, until the copy was returned to McCabe in the following November.

The testimony of Adams had reference only to statements made in the forenoon of the day on which the transaction had occurred and prior to its consummation. Various circumstances connected with the dealings between the parties tend to corroborate the testimony of plaintiff's witnesses. It is admitted that the property had been offered for sale and that West wanted to buy; that the matter was discussed by them, and that something was said by McCabe about getting the mortgage released, and that he caused the privilege of purchasing the lands to be included in the lease offered. It is not to be presumed that when the statement to the effect that West should have the privilege of purchasing was made and then inserted in the contract, no price had been mentioned between them. It would not be in harmony with the usual dealings between men to assume they would be so careless as to agree to sell and buy without any reference either to price or terms. Plaintiff retained the instrument for several months when he should have returned it, but this unfavorable circumstance is overcome by the statement in the lease to the effect that he could purchase the land if desired, as well as by the additional incident from which it appears that about the time he wrote plaintiff he would rescind the lease (10 months after the oral agreement) defendant had concluded to erect a depot on the property, evidently deeming the property to be of much more value than on March 14 of the preceding year, all of which may have furnished the motive for rescind-

ing the contract. It does not appear plausible that he would have taken the trouble to have written the provision in the lease regarding the sale if none had been intended.

We have the positive testimony of plaintiff as to the facts sustained, not only to a large extent by defendant's statements, but by the several events connected with the transaction. It is true plaintiff is an interested witness, but no less interested than the agents of defendant. Men holding positions such as general managers, local agents, etc., as a rule, are as much interested in retaining the good will and in elevating themselves in the estimation of their employers as are persons who may become interested in proceedings directly involving their own property rights. The difference lies in the nature of the expected results, not in the effect upon the testimony of the witness. Each wields the same influence, whether conscious or otherwise. While plaintiff was not entirely free from fault, which fault consisted in his neglect to return the written lease at as early a date as possible, his neglect in this respect presents a different aspect when it is remembered that the agreement was to be drawn and signed at their leisure. With that understanding, possession was given and the rent paid. No question was raised as to the lease being in full force, nor is sufficient reason either alleged or proven to establish defendant's right to cancel the lease at its will, yet, notwithstanding it admits facts showing a full compliance with the terms of the lease as such, defendant assumed the right to, and did, revoke it. We think the parol agreement to lease, with option to purchase for $1,500, is clearly established by the evidence. The questions then left for us to consider are: (1) Had McCabe the authority to make the agreement to sell? (2) Can the oral lease and option be enforced in equity?

2. It is admitted by the pleadings that the defendant, at the time of the agreement, held title to the premises, subject only to the mortgages thereon; that McCabe at that time was its vice-president and general manager; that the written lease was executed by him in that capacity; that he received $100 under the

parol agreement, and placed plaintiff in possession of the lots. He also admits that he was its general manager, and, as such, offered to dispose of its realty. No attempt having been made to show that he was acting outside of his duties as such manager, it will be presumed that he was acting within the scope of his agency in the dealings had with plaintiff. When McCabe testified that he was general manager, he thereby gave evidence that he was agent for the company in all its dealings. In effect he became, in his dealings with the public, the corporation itself. He and Adams testified they had no authority to contract for the sale of land, but this evidently was only their opinion, which probably results from the fact that McCabe knew the land was mortgaged; but the other facts in the testimony show conclusively, as a matter of law, that he did have such authority, and so assumed and acted at the time of making the parol lease. When asked if he had been looking after the sale of the property, he stated: "I had authority to dispose of it, and placed it with a real estate firm," although on cross-examination he stated that he had no authority except through the trustee. Whatever conclusion may be deduced from these statements, it is unquestionably shown that he was the general manager and vice-president of the company, and acted as such in the handling of this particular land along with its other property. These circumstances, taken together with the conceded fact that the money was paid to him, by him turned over to and retained by the company, are sufficient to manifest at least a ratification of his acts, and inevitably leads to the conclusion that he had full authority to bind defendant: *Kyle* v. *Rippey*, 20 Or. 446, 454 (26 Pac. 308) ; *Finnegan* v. *Pacific Vinegar Co.* 26 Or. 152 (37 Pac. 457) ; *Moore* v. *Crawford*, 130 U. S. 131 (9 Sup. Ct. 447 : 32 L. Ed. 878) ; *Jacksonville, M. & P. Ry. & Nav. Co.* v. *Hooper*, 160 U. S. 515 (16 Sup. Ct. 379 : 40 L. Ed. 515) ; *Union Stockyard & T. Co.* v. *Mallory S. & Z. Co.* 157 Ill. 554 (41 N. E. 888 : 43 Am. St. Rep. 341) ; *Atlantic & Pac. Ry. Co.* v. *Reisner*, 18 Kan. 458.

3. It is further urged that the minds of the parties never met, thereby rendering an agreement impossible. It is true both

parties did not execute the written instrument, but it clearly appears that everything was fully understood between them at their last meeting at West's residence on the afternoon of March 14, 1900, and that plaintiff immediately thereafter, with defendant's assent, entered upon the performance of his part of the contract. They are in the same position as if no writing had ever been drawn or tendered further than that such instrument was admissible in evidence as a circumstance tending to show an agreement to lease with option to purchase, as well as indicating the conceded portion of the parol contract. The parol agreement is shown to be certain and definite in its terms, and to be such as can be enforced.

4. We are not unmindful of the well-established and recognized rule that when the testimony is taken in the presence of the court, as in this case, great weight should be given the findings of the lower court on disputed questions of fact; but evidently the learned court below assumed the rule to be, as stated by some text-writers, as well as held by the courts in some states, that the contract must not only be shown to be clear and definite, but must be established beyond a reasonable doubt. This court has heretofore, and we think wisely, refused to accede to this doctrine. As stated in *Sprague* v. *Jessup,* 48 Or. 211 (83 Pac. 145 : 4 L. R. A., N. S., 410) : "The certainty of such a contract must be established by evidence sufficient to satisfy a court of equity of the truth of the allegations of the complaint"; but, "if the denial of a party against whom specific performance of an oral contract to convey real property is sought to be enforced is sufficient to defeat the right, it is quite probable that this equitable remedy would soon cease to be efficacious."

5. The proof leading to the conclusion reached in that suit was not so strong as in the case at bar, but it is there held that possession taken under the contract to purchase with part payment was sufficient to take the case out of the statute of frauds. In the case before us part payment and possession, as well as improvements made under the contract, are conceded, and we are fully convinced, after a careful examination of the testi-

mony, that the option to purchase was included in the parol contract. It is immaterial that defendant may have subsequently disclaimed a part of the terms agreed upon and refused to place them in writing, for the result must be determined, as in *Sprague* v. *Jessup,* not upon the rejected written instrument, but upon the previously consummated oral agreement.

6. It is contended that, this agreement being oral, specific performance cannot be enforced. This position overlooks the fact that possession was taken under the lease, permanent improvements made thereon, and one year's rent advanced and retained by the company. It is well settled in this state that part performance of a parol contract under such circumstances takes the case out of the statute of frauds: *Wallace* v. *Scoggins,* 18 Or. 502 (21 Pac. 558: 17 Am. St. Rep. 749) ; *House* v. *Jackson,* 24 Or. 89 (32 Pac. 1027) ; *McMahan* v. *Whelan,* 44 Or. 402 (75 Pac. 715) ; *Sprague* v. *Jessup,* 48 Or. 211 (4 L. R. A., N. S., 410: 83 Pac. 145) ; *Dechenbach* v. *Rima,* 45 Or. 500, 502 (77 Pac. 391, 78 Pac. 666). In *Wallace* v. *Scoggins* plaintiff brought suit for specific performance of a parol lease on certain alleged premises. It appears she had leased by oral agreement certain property for two years at an agreed rental of $40 per month, entered into possession, paid the rent regularly, and fitted up the property at considerable expense. The court below held the lease to be valid for only one year, and that, as plaintiff had a remedy by action for unlawful detainer, dismissed the suit. On this point Mr. Justice Strahan, after mentioning the facts, said: "Do these acts, as part performance of this lease, on the part of both parties to it, entitle the plaintiff to have the same specifically enforced? I think they do. They are substantial on both sides, and go to the substance of the contract, and it would hardly be possible to restore the plaintiff to the condition she was in before the acts were performed. Relying upon the terms of the parol agreement, she incurred expenses and changed her circumstances and condition to such an extent that a refusal on the part of the defendant to perform operates as a fraud on the rights of the plaintiff. As I understand the

rüle, this is such a part performance of the parol agreement as takes the case out of the operation of the statute of frauds." There can be no question that, to entitle a person to specific performance of a contract, there must have been at the time of entering into the agreement a mutuality both as to the obligation and the remedy; and the party not bound cannot enforce the contract. But, as stated by Mr. Justice MOORE, in *House* v. *Jackson,* 24 Or. 89 (32 Pac. 1027), "this general rule, like most others, has its apparent exceptions"; and, after quoting from Waterman, Spec. Perf. § 200, on this point, observed: "Such exception is less real than apparent; for, when the option is accepted, the minds of the parties have met and agreed upon the terms of the contract, and it thus becomes mutual, and is enforceable by either party." It was there held that under an agreement to lease, with an option to purchase, the contract to pay rent was sufficient consideration to support the option.

7. It is immaterial under the testimony as to the form in which the tender of rent may have been made, as defendant notified plaintiff that no payments of any kind would be accepted, thereby making a tender unnecessary as a condition precedent to his right to specific performance: *Guillaume* v. *K. S. D. Fruit Land Co.* 48 Or. 400 (86 Pac. 883).

8. It appears from the decision of the lower court contained in the transcript that one of the points upon which its conclusion is based is that, as the written lease contained the phrase "as soon as title is perfected" after the purchasing clause, this provision constitutes a condition attached to the privilege of purchasing, whether for the sum mentioned or at any price, and is "a limitation" which "the evidence does not show was ever removed." This overlooks the admissions in the pleadings, as well as the point that the defendant claims the title to be affected only to the extent of the lien created by the mortgage on the property. The complaint alleges that at the time of entering into the oral agreement "defendant was the owner in fee, and in possession," of the property. The answer not only admits this allegation to be true, but alleges that during all the

49 OR.—— 29

times referred to in the complaint "defendant has been and still is the owner of lots 1, 7 and 8, in block 74," etc., alleging that this property was covered by the real mortgage thereby described. The only way defendant attempts to show that the title is. affected is by the mortgage lien. When used in this manner, the word "owner" has a definite meaning, and is one who has dominion over a thing, which he may use as he pleases, except as restrained by law or by agreement: *Johnson* v. *Crookshanks,* 21 Or. 339 (28 Pac. 78) ; *Garver* v. *Hawkeye Ins. Co.* 69 Iowa, 202 (28 N. E. 555); *Bowen* v. *John,* 201 Ill. 293 (66 N. E. 357). Defendant then is restrained, if at all, only by the agreement contained in the mortgage. There is nothing to prevent it executing a deed subject to the mortgage on the property. The use of the words "as soon as title is perfected," when construed in the most favorable light to the defendant, indicates at least an agreement to permit plaintiff to purchase as soon as the mortgage is released.

9. Any provision made relative to the release of the mortgage was for the protection of the mortgagor, and therefore one which the lessee can waive. Having brought suit for the specific performance, defendant waives the incumbrance on the property until after the execution of the deed, and on the payment of the $1,500 agreed upon is entitled to a conveyance, after which defendant is entitled to a reasonable time, not to exceed the period for which the lease and option was given, in which to procure a release of the mortgage thereon. It is well established that suits in equity may be maintained for specific performance, even where the vendor at the time of filing the complaint is incapable of giving a complete title to the property agreed to be sold. To hold otherwise would be to permit the vendor to take advantage of his wrong. Courts of equity, therefore, allow the purchaser to proceed with the purchase or abandon it, as may be desired: 26 Am. & Eng. Enc. Law (2 ed.), 83; Story, Equity, § 779; *Thompson* v. *Hawley,* 16 Or. 251 (19 Pac. 84) ; *Brown* v. *Ward,* 110 Iowa, 123 (81 N. W. 247) ; *Young* v. *Paul,* 10 N. J. Eq. 401 (64 Am. Dec. 456) ; *Graft* v. *Loucks,* 138 Pa. 460 (21 Atl. 203).

10. A parol agreement, clear and certain in its terms, having been satisfactorily established by the testimony, plaintiff is entitled to be reinstated and to be placed in possession of the property under his lease, with the option of purchasing for the price agreed upon.   On tender of $1,500, plaintiff is entitled to such deed as defendant can execute.   As to whether plaintiff exercises his option or retains the property as lessee during the time prescribed in the contract is a matter entirely within his discretion.

11. A court of equity in the exercise of its discretion, where the payment of mortgages, or other liens, becomes necessary to perfect the title, may enter judgment for sufficient sum to cancel such lien, if any (*Thompson* v. *Hawley,* 16 Or. 251, 19 Pac. 84; Waterman, Spec. Perf. §§ 503, 505) ; but each case should be and is governed by its own circumstances: Section 504.   In the case before us it is evident from the record that defendant can procure the release of the mortgage to the particular tracts involved at any time, if desired, and, its solvency not being questioned, we deem such judgment unnecessary.   The question, therefore, of release of the mortgage liens upon the property, if any, remaining after execution of a conveyance to plaintiff, should, in this instance, be left for such determination as may be deemed proper in the event the option should be exercised.

A court of equity, after acquiring jurisdiction, as incidental to the remedy, may assess such damages as appear to have been sustained prior to the filing of the complaint: Waterman, Spec. Perf. § 5; *Fleischner* v. *Citizens' Invest Co.* 25 Or. 119, 131 (35 Pac. 174) ; *Bishop* v. *Baisley,* 28 Or. 119, 138 (41 Pac. 936) ; *Case* v. *Minot,* 158 Mass. 577 (33 N. E. 700) ; *Rugg* v. *Rohrbach,* 110 Ill. App. 532.   Plaintiff insists that he has been damaged $500, which amount he states could have been realized from the property up to the time of the trial, and for which sum judgment is asked.   Defendant admits the rental value of the property to have been at least $120 per annum, and is uncertain as to whether it was rented to Schultz for that amount or for $130, while plaintiff testifies positively that the rental value was at least $130.   We think it safe to assume that plaintiff

has been injured to the extent of the difference between the rent agreed upon and the rental value, or $30 per annum, from the date of being dispossessed to the time of filing the complaint. As to whether plaintiff has been damaged since the commencement of the suit cannot be determined under the issues here. It is shown that plaintiff has expended $50 in improvements on the property, which, without reimbursement have been removed by defendant. After deducting the unpaid rent to date of filing the suit, we find plaintiff's damage, including loss of improvements, is approximately $50. Plaintiff is entitled to a decree placing him in possession of the premises described in the complaint on payment of rent at $100 per annum since date of suit, and to an injunction inhibiting defendant from interfering in any manner with his possession thereof during the period of his lease, with the privilege of purchasing and receiving a deed therefor from defendant at any time during the ten-year period upon tendering to it the sum of $1,500, and is entitled to damages in the sum of $50.

12. Plaintiff will be allowed his costs and disbursements on appeal.

The decree of the circuit court should be reversed, and one entered in conformity with this opinion.          Reversed.